**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION
DOCKET NUMBER

|  |  |
|---|---|
| JODI B. MATT | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HSBC BANK USA, NATIONAL | ) |
| ASSOCIATION, ON BEHALF OF THE | ) |
| TRUST FUND AND FOR THE BENEFIT OF | ) |
| ACE SECURITIES CORP. HOME EQUITY | ) |
| LOAN TRUST SERIES 2005-HE4 ASSET | ) |
| PASS THROUGH CERTIFICATES, BANK | ) |
| OF AMERICA HOME LOAN SERVICING | ) |
| F/K/A/ COUNTRYIDE HOME LOAN | ) |
| SERVICING, COUNTRYWIDE HOME LOANS | ) |
| SERVICING LP, HSBC BANK USA | ) |
| NATIONAL ASSOCIATION, ACE | ) |
| SECURITIES CORPORATION, WELLS | ) |
| FARGO BANK NATIONAL ASSOCIATION, | ) |
| DEUTSCHE BANK SECURITIES INC., | ) |
| DEUTSCHE BANK NATIONAL TRUST, DB | ) |
| STRUCTURED PRODUCTS INC. | ) |
| COMPANY, COUNTRYWIDE SECURITIES | ) |
| CORPORATION, THE MURRAYHILL | ) |
| COMPANY, NORTHEAST MORTGAGE | ) |
| COMPANY, NEW CENTURY MORTGAGE | ) |
| CORPORATION, BRAD A. MORRICE, | ) |
| PATTI M. DODGE, DAVID N. | ) |
| KENNEALLY, HARMON LAW OFFICES | ) |
| P.C., STANTON AND DAVIS, and | ) |
| LAURA M. TOMASELLO, ESQ. | ) |
| | ) |
| Defendants | ) |

**PLAINTIFF'S VERIFIED COMPLAINT**
**SEEKING DAMAGES AND EQUITABLE RELIEF INCLUDING**
**EMERGENCY INJUNCTIVE RELIEF TO STOP FORECLOSURE**

I. PRELIMINARY STATEMENT

1.      Ms. Matt brings this action for damages and to enjoin a
foreclosure proceeding scheduled for September 27, 2010, and

instituted against her by HSBC Bank, USA, National
Association on behalf of the Trust Fund and for the Benefit
of Ace Securities Corp., Home Equity Loan Trust Series 2005
HE-4, Asset Pass Through Certificates.

2.      The facts of this case painfully illustrate the painful
deviation from traditional mortgage lending practices, that
the securitized, secondary market lending industry utilizes.

3.      As part of the securitized market "enterprise", the
various Defendants had defined and undefined roles in the
securitization of Ms. Matt's loan.

4.      Unfortunately, under information and belief the actions
of the Defendants in this action are not uncommon, and
actually quite commonplace. The reason for parties such as
the named Defendants here, continuing the charade being
perpetrated here, is that over 90% of the time the borrower
never questions or challenges anything related to the
foreclosure process. These "lenders" prey upon the citizens
of the Commonwealth's

## II.  JURISDICTION

5.      This action is within the original jurisdiction of the
U.S. District Court, under 28 U.S.C. § 1331, which provides
that "[t]he district courts shall have original jurisdiction
of all civil actions arising under the laws, or treaties of

the United States." 28 U.S.C. § 1331. Plaintiff has alleged
a claim under the Federal RICO statute 18 U.S.C. § 1962 (a)-
(d).

6.     As further basis for the exercise of original
jurisdiction by this court, under 28 U.S.C. § 1332, which
provides in pertinent part, that "[t]he district courts
shall have original jurisdiction of all civil actions where
the matter in controversy exceeds the sum or value of
$75,000.00, exclusive of interest and costs, and is between
citizens of different states" 28 U.S.C. § 1332(a)(1).

7.     Plaintiff's state law claims under 28 U.S.C. § 1367,
"in any civil action of which the district courts have
original jurisdiction, the district courts shall have
supplemental jurisdiction over all other claims that are so
related to claims in the action within such original
jurisdiction that they form part of the same case or
controversy..."

## III. PARTIES

8.     Plaintiff, Jodi B. Matt ("Ms. Matt") is a natural
person who resides at 41 Downes Avenue, Canton,
Massachusetts.

9.     Defendant, HSBC Bank USA, National Association is the
Trustee for ACE Securities Corp., Home Equity Loan Trust,

Series 2005-HE4, a for profit, common law Trust. HSBC Bank
USA, National Association will be the Trustee under the
Pooling and Servicing Agreement. The Trustee's corporate
trust office is located at 452 Fifth Avenue, New York, New
York 10018, Attention: Corporate Trust, ACE Securities
Corp., Home Equity Loan Trust, Series 2005-HE4.

10.    Defendant, Ace Securities Corporation ("Ace") is a
corporation with its principal place of business at 6525
Morrison Boulevard, Suite #318, Charlotte, North Carolina.

11.    Defendant, Countrywide Home Loans Servicing LP is a
Limited Partnership with its principal place of business at
7105 Corporate Drive, Plano, Texas.

12.    Defendant, Wells Fargo Bank, National Association is a
corporation with its principal place of business at 420
Montgomery St., San Francisco, California.

13.    Defendant, Deutsche Bank Securities Inc. is a
corporation with its principal place of business at 60 Wall
St., New York, New York.

14.    Defendant, Deutshe Bank National Trust Co. is a
corporation with its principal place of business at 60 Wall
St., New York, New York.

15.    Defendant, DB Structured Products Inc. is a corporation
with its principal place of business at 60 Wall St., New

York, New York.

16.    Defendant, Countrywide Securities Corporation is a corporation with its principal place of business at 4500 Park Granada, Calabasas, California

17.    Defendant, The Murrayhill Company is a corporation with its principal place of business at 1700 Lincoln Street, Suite 1600, Denver, Colorado.

18.    Defendant, Northeast Mortgage Company is a coporation with its principal place of business at 800 Main Street, Suite 225, Southbury, Connecticut.

19.    Defendant, New Century Mortgage Corporation is a corporation with its principal place of business at 18400 Von Karman, Suite 1000, Irvine, California.

20.    Defendant, Brad A. Morrice is an individual that resides at 106 Twenty Forth Street in Newport Beach, California.

21.    Defendant, Patti M. Dodge is an individual that resides at 26 Oroville, Irvine, California.

22.    Defendant, David N. Kenneally is an individual that resides at 2662 Oak Knoll Drive, Rossmoor, California.

23.    Defendant, Stanton and Davis is a sole proprietorship with its principal place of business at 1000 Plain Street, Marshfield, Massachusetts.

24.     Defendant, Harmon Law Offices, PC is a professional
coporation with its principal place of business at 150
California Street, Newton Massachusetts.

25.     Defendant, Nationwide Title and Escrow Company Inc. is
a coporation with its principal place of business at 400
Reservoir Ave, Suite 2K, Providence Rhode Island.

26.     Defendant, Laura M. Tomasello is an individual that
resides at 39 Ticklefancy Lane, Salem, New Hampshire.

### IV FACTS

27.     In early 2005, prior to the defendant closing on a loan
with Northeast Mortgage, the Defendant had no mortgage or
other debt on her home, which had a value of over $750,000
as indicated by the Defendants own documents.

28.     On March 18, 2005, Ms. Matt had applied for a loan with
Northeast Mortgage Co. and was given a loan application and
other such documents including but not limited to a Good
Faith Estimate and a Truth-In-Lending Disclosure Statement
attached hereto as **Exhibit 1**. The documents contained the
promised interest rate of 8.158% and a monthly payment of
$1,329.26.

29.     On April 6, 2005, a representative of Defendant
Northeast Mortgage Company made an appearance at Ms. Matt's

residence requesting that Ms. Matt sign the Loan Documents.
In addition to the other customary documents the Defendant
(or its closing attorney) substituted a new Truth-in Lending
Disclosure and Good Faith Estimate, than what had been
previously provided and relied upon by Ms. Matt. The new
documents evidenced a 10.528% interest rate and a monthly
payment ranging $1,429.37 to $1,806.23 after 12 months,
attached hereto as **Exhibit 2**. During the signing of the
documents, these changes were never explained and agreed to
by Ms. Matt, nor did the representative explain any of the
documents.

30.    In August 2005, Countrywide Home Loans began servicing
Ms. Matt's loan, increasing the rate of interest and adding
a property tax escrow, attached hereto as **Exhibit 3**, which
made it exceedingly difficult for the Ms. Matt to make her
monthly payments. By the end of 2005 the loan was in
default.

31.    In February 2006, Ms. Matt's monthly mortgage payment
increased significantly and subsequent to this increase, the
loan had become several months delinquent. After requesting,
and being denied by the bank, to honor the original interest
and payment amounts of the mortgage contract, Ms. Matt
entered into a repayment plan and Countrywide Home Loans
agreed to accept payments.

32.    <u>In late 2006 and early 2007</u>, After receiving invitations to refinance by Countrywide in the monthly statements, the Plaintiff tried refinancing with Countrywide's spectrum division in January 06' and March 07'. However Countrywide/Spectrum wanted approximately $10,000 in points and cost associated with the transaction in order to lower the interest rate to a rate that was higher than the existing loan attached hereto as **Exhibit 4**.

33.    <u>In October 2007</u>, Ms. Matt received a foreclosure notice from <u>Countrywide's</u> council. At that time the loan was 3 months in the arrears, attached hereto as **Exhibit 5**.

34.    <u>In November 2007</u>, at Countywide Loans request, Ms. Matt sent a letter to <u>Countrywide</u> requesting assistance due to financial hardship; along with her proof of income, attached hereto as **Exhibit 6**.

35.    <u>In February 2008</u>, at Defendants urging, Ms. Matt requested by letter a loan modification based on her loss of employment with the same company for 17 years and the interest rate increase, attached hereto as **Exhibit 7**.

36.    <u>In April 2008</u>, the Plaintiff was in fear of losing her home because <u>Countrywide</u> was threatening foreclosure on April 15th, 2008, so she cashed in her lifelong 401K for over $60,000, receiving around $30,000 in penalties. Ms. Matt

tendered to the Defendant over $34,000 for reinstatement and modification approval from around 12% to 6.99% attached hereto as **Exhibit 8**.

37.    In September 2008, Countrywide requested Ms. Matt to send a letter requesting an interest rate change due to affordability and back up financials. Ms. Matt sent the letter on September 29, attached hereto as **Exhibit 9**.

38.    In November 2008, Countrywide informed the Ms. Matt that her new rate would be changed to 6.99%, and to be calculated from the time of default, which was in July or August. They also indicated that Ms. Matt would be receiving a Federal express package in a few weeks to review. No such package ever arrived.

39.    In December 2008, Countrywide informed Ms. Matt she would be eligible for a new program that would reduce her payments to 2%, and she qualifies. Ms. Matt was told that if acceptance was not granted, the worst case scenario would be a 6.99% rate.

40.    In January 2009, Ms. Matt was told that the process could take another 60 days.

41.    In March 2009, Countrywide informed Ms. Matt that the modification request was denied because the Plaintiff's

Case 1:10-cv-11621  Document 1  Filed 09/23/10  Page 12 of 70

income was too high. After inquiry, it was determined by Countrywide that they calculated Plaintiff's salary incorrectly; weekly and not biweekly, and they would re-submit application.

42.    In May 2009, Countrywide informed the Plaintiff that Bank of America is now in charge of the loan and we would be receiving documents modifying the loan with an interest rate over 9% and increased escrow payments.

43.    In June 2009, after receiving an approved modification package, attached hereto as **Exhibit 10**, Ms. Matt contacted Bank of America and indicated that the rate was supposed to be no greater than 6.99%, include no escrow, and that the arrears would be calculated from the date of default. Bank of America said it would re-send the proper modification package.

44.    In July thru September 2009, Ms. Matt made several calls to the Defendant inquiring about the Modification package. Ms. Matt was told at all times that the modification was being processed and she would have to be patient.

45.    On September 14, 2009, Bank of America sent a Notice of Intent to Foreclose, attached hereto as **Exhibit 11**.

46.     Subsequent to the origination of Ms. Matt's loan
Northeast, Defendant Northeast then made a purported
"assignment" attached hereto as **Exhibit 12**, of Ms. Matt's
mortgage loan to New Century Mortgage Corporation on April
6, 2006, the very same day that Northeast originated Ms.
Matt's loan.

47.     Subsequent to the purported Northeast assignment of the
Ms. Matt's Note and mortgage to New Century Mortgage
Corporation, New Century Mortgage Corporation purportedly
"assigned" Ms. Matt's Note and mortgage to Defendant HSBC on
November 6, 2007 attached hereto as **Exhibit 13**, (at a point
in time when New Century Mortgage Corporation was in fact an
adjudged bankrupt).

48.     Ms. Matt was no longer able to make the high monthly
payments required by the Northeast Loan, after increase in
payments and the downturn in the economy.

49.     On January 27, 2010, through its attorney Stanton &
Davis, HSBC, as the purported trustee for the
certificateholders of ACE Securities Corp. Home Equity Loan
Trust Series 2005-HE4 Asset Pass Through Certificates, filed
an action in the Massachusetts Land Court under the
Servicemembers' Relief Act. Under case number 10 MISC
421195, HSBC asserted that it is the current "holder" of the
Plaintiff's mortgage.

Case 1:10-cv-11621   Document 1   Filed 09/23/10   Page 14 of 70

50.     On March 3, 2010, Ms. Matt filed a Motion to Dismiss the Servicemembers' Action, attached hereto as **Exhibit 14**, brought by the Defendants, on the grounds that Defendant HSBC lacked standing to bring a complaint against Ms. Matt in a Massachusetts trial court.

51.     The Land Court made a finding that in Servicemembers' Actions, as a condition precedent, HSBC must first establish its standing prior to ever reaching the military question involved in the Servicemembers' Action, attached hereto as **Exhibit 15**.

52.     The Land Court did not apply any analysis of the facts in Plaintiff's case to the requirements of G.L. c. 244 § 14,

53.     During the course of the Land Court action, the court asked Defendant HSBC to provide further evidence to bolster its claim that it is the current owner of the Matt loan, In response to the court's request, attached hereto as **Exhibit 16**, HSBC (through Bank of America Home Loans ("BAC"), and its new attorney Harmon Law Offices, P.C.) provided evidence that Countrywide (now BAC) is currently "servicing" the loan under the Trust's governing instrument. Therefore HSBC never proffered evidence that it did have standing to bring an action to foreclose.

54.     Plaintiff's counsel stated in its response to Defendants proffer to the Land Court's request for further evidence above, that these actions by Defendants were evidence of a potential attempt to place a fraud upon the court, the registry of deeds, and the certificateholders of both the HE-4 and HE-2 trusts. To date all of the Defendants have worked in concert with regards to all aspects of this case, attached hereto as **Exhibit 16**.

55.     On July 8, 2010, The Land Court issued an order, attached hereto as **Exhibit 15**, stated that while it appeared that HSBC **did not have any current standing** under the Servicemembers Act, HSBC had the ability to **become** the holder of the Matt loan in the future. As such, the court felt that this was enough to provide HSBC standing solely with regards to the Servicemembers' Act hearing. The court went on to specifically note (at note 4 on page 2 of the Order) that the court had serious reservations as to HSBC's ability to have received a valid assignment from a bankrupt entity (New Century) on November 6, 2007.

56.     Therefore HSBC never proffered any evidence that it was the holder of the Matt Note under the requirements of G.L. c. 106 (with the ability to enforce it) or that it was in contractual privity of contract in order to enforce the power of sale in Ms. Matt's mortgage.

57.     Leaving aside the failure of HSBC to provide **direct evidence** of a legally valid assignment of Ms. Matt's Note and mortgage from New Century Mortgage Corporation to HSBC on November 6, 2007, Defendants proffer of evidence requested by the Land Court, BAC through its new attorney, Harmon Law Offices, P.C., produced an "**Acquisition Memo**", showing that Ms. Matt's loan was "ultimately purchased by ACE Securities Corp. Home Equity Loan Trust Series 2005 **HE-2, not the foreclosing HE-4 Trust,** see attached hereto as **Exhibit 17 (Paragraph 14 "Ultimate Disposition of Loans")**.

58.     On August 19, 2010, under Rule 9 of the Rules of the Land Court, Ms. Matt submitted a Motion for Reconsideration of the Land's Courts adverse ruling, attached hereto as **Exhibit 18**. As the rules of civil procedure are excluded from application under Mass. Civ. R. P 81(a)(1), Ms. Matt was prevented from seeking a Motion to Vacate Judgment.

59.     On August 20, 2010, the Land Court issued a four line denial, attached hereto as **Exhibit 19**, of Ms. Matt's Motion for Reconsideration, citing that it was not timely filed under Mass. Civ. P. R. 59(e), as well as it merits. As discussed the Massachusetts Rules of Civil Procedure have no applicability in Servicemembers actions.

60.     In its denial of Ms. Motion for Reconsideration, the court ordered "Judgment to issue", as of the date of this

Case 1:10-cv-11621 Document 1 Filed 09/23/10 Page 17 of 70

complaint there has been no entry of judgment in this matter.

61.    On September 17, 2010, due to the fact that the Land Court's Judgment has not yet been officially entered, Ms. Matt filed a Petition for **Interlocutory Appeal under G.L. c. 231 § 118** to the Massachusetts Appeals Court, attached hereto as **Exhibit 20**.

## V. AFFIRMATIVE DEFENSES TO THE UNDERLYING FORECLOSURE ACTION

62.    Ms. Matt alleges that due to the predatory nature of her mortgage contract, the actions of Northeast Mortgage Corporation extend to HSBC, and therefore provide an absolute defense to the impending foreclosure action.

63.    Ms. Matt alleges that the acceleration of her note was improper and in violation of the terms of the mortgage contract.

64.    Ms. Matt alleges that the Defendants Countrywide/Bank of America, and HSBC failed to seriously consider their loan modification offer that would have cured any alleged default.

65.    Ms. Matt alleges that Defendant Countrywide/Bank of

Case 1:10-cv-11621-PBS Document 1 Filed 09/23/10 Page 18 of 70

America failed to comply with applicable mortgage servicing
guidelines and agreements as such a condition precedent to
acceleration and foreclosure has been violated requiring the
dismissal of the underlying complaint to foreclose in the
Land Court.

66.    Ms. Matt challenged Defendant HSBC's standing to bring
its complaint to foreclose in Land Court. During the
hearings involved in this matter, HSBC, through its mortgage
servicer Bank of America Home Loans and its attorney Harmon
Law Offices, P.C. proffered evidence showing that in fact
Ms. Matt's loan was ultimately purchased by a completely
different trust that the entity attempting to currently
foreclose Ms. Matt's mortgage. Ms. Matt's attorney has
raised significant questions as to the highly questionable
actions of all parties in the furtherance of this enterprise
as against Ms. Matt. Ms. Matt is currently appealing the
Land Court's denial of her claim that HSBC lacks standing in
the Land Court action.

67.    At no time has Defendant HSBC ever adduced any direct
evidence that it received a legally valid assignment of Ms.
Matt's Note under G.L. c. 106 or the assignment of her
mortgage contract in accordance with traditional contract
principles, nor can it ever do so as it has proffered
evidence that it received an assignment from New Century
Mortgage Corporation on November 6, 2007 (who was an

adjudged bankrupt as of this date).

68.    The Trust's governing instrument, the Pooling and
       Servicing Agreement and Prospectus Supplement, attached
       hereto as **Exhibit 21**, require that all of the underlying
       collateral (mortgage loans) for the certificates to be
       issued by the Defendant Trust, actually be assigned to the
       Trust on or before June 29, 2005. HSBC's own proffer
       uncontrovertibly proves that this did not occur, and as such
       the Trust's ownership interest is forever fatally flawed,
       and thus it lacks any standing in this matter as against Ms.
       Matt.

69.    Ms. Matt alleges that HSBC (as trustee) lacks standing
       to initiate a foreclosure action against her. As grounds
       therefore, Ms Matt is willing to provide at an evidentiary
       hearing, proof of said lack of said standing.

70.    Under information and belief, Defendants acted in
       concert to further the illegal foreclosure action, by
       proffering false documents with the intent to perpetrate a
       fraud upon the court, the registry of deeds, and the
       investors of the Plaintiff trust, therefore HSBC comes to
       the foreclosure action with unclean hands.

71.    Ms. Matt is currently appealing the Land Court order in
       the Land Court Servicemembers hearing as an interlocutory

matter. As of the date of this filing, Judgment in that
matter has yet to officially enter.

### V1 CAUSES OF ACTION

#### COUNT I: PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF
#### (As against Northeast Mortgage Corporation, New Century
#### Mortgage Corporation, and HSBC)

72.    Ms. Matt repeats and realleges all paragraphs above as
set forth fully herein.

73.    On information and belief, and predicated upon
Defendants own proffers in Land Court, HSBC does not have
the right to act pursuant to the power of sale in Ms. Matt's
mortgage contract, because HSBC did not receive a legally
valid assignment of Ms. Matt's mortgage contractual rights
from New Century, who was bankrupt at the time of said
assignment. Further, Defendant(s) proffered evidence
indicating that Ms. Matt's mortgage is actually "owned" by a
completely different Trust that Defendant(s).

74.    Therefore, HSBC is not in contractual privity with Ms.
Matt, and therefore cannot exercise non-existent rights
under the power of sale as against Ms. Matt.

75.    HSBC has not produced evidence that it legally holds
Ms. Matt's Promissory Note.

76.     Over 175 years of Massachusetts case law regarding
        mortgage foreclosure illustrates the fact that where a
        mortgage is given as security for a promise to repay an
        advance of money (as is this case before this court), the
        mortgage is to be construed in conjunction with the
        underlying obligation. "In a mortgage, the Note is the
        primary document, and the mortgage itself is only the
        security for the payment of the Note" §9.3 Eno & Hovey, 28
        Massachusetts Practice: Real Estate Law.

77.     It is axiomatic that the mortgage follows the Note,
        however even this statement has limitations if the Note is
        obtained by an assignee without supplying consideration
        (value).

78.     Indeed, Massachusetts courts have long found that the
        Note is the principal document and that the mortgage is only
        evidence of the indebtedness. "In determining the rights of
        the plaintiff, the Note and mortgage are to be construed
        together" Strong v. Jackson 123 Mass. 60, 64. In U.S. Trust
        Co. v. Commonwealth, 245 Mass. 75, 78, the court stated "The
        debt is the principal thing and the mortgage an incident."

79.     While Massachusetts is a title theory state, and a
        transfer of mortgage is technically a transfer of an
        interest in property, Massachusetts courts have consistently

stated that an assignment of a mortgage is qualified. "It is true that a mortgage on real estate has the inherent characteristics of real estate, but it is a conveyance of real estate or of some interest therein, defeasible upon the payment of money or the performance of some other condition." Merritt v. Harris, 102 Mass. 326.

80.     Unlike Ms. Matt's promissory Note, which is governed by G.L. c. 106 (Article 3 of the Uniform Commercial Code), her mortgage is a separate contract entered into between the borrower and the "lender", in which the borrower agrees to forfeit the home if the Note is defaulted upon. Therefore the mortgage, and the assignment thereof is governed by traditional contract rules.

81.     Further, the Massachusetts courts have found that the effectiveness of an assignment of mortgage is linked to the existence of the underlying debt, "[the mortgage] is a title as collateral security for the mortgage debt, if the debt was not in existence, the assignee could take. under any circumstances. at most a naked legal title to the mortgage." Morris v. Bacon, 123 Mass. 58,59, See also Kaufman v. Federal National Bank of Boston, 287 Mass. 97, 100-101.

82.     As discussed, Massachusetts Courts have frequently spoken to the fact that where a mortgage is given to secure an underlying debt (such as here), the mortgagee at most

holds bare legal title to the premises, which is defeasible
upon the borrower satisfying the underlying obligation,
"Prior to breach of the statutory condition, see G.L. c.
183, § 20, the mortgagee holds bare legal title to the
property subject to defeasance on the mortgagor's
performance of the obligation secured by the mortgage".
Perry v. Miller, 330 Mass. 261 (1953). Pineo v. White, 320
Mass. 487 *(1946)*. *"It is only for the purpose of securing
the debt that the mortgagee is to be considered owner of the
property"*. Boston v. Quincy Mkt. Cold Storage & Warehouse
Co., 312 Mass. 638, 649 (1942). Krikorian v. Grafton Co-op.
Bank, 312 Mass. 272, 274, (1942). "(A)ll the statutes upon
the subject (i. e., mortgages) are to be so construed; and
all rules of law, whether administered in law, or in equity,
are to be so applied, as to carry these objects into effect.
" Ewer v. Hobbs, 5 Metc. 1,3 (1842). "Literally, in
Massachusetts, the granting of a mortgage vests title in the
mortgagee to the land placed as security for the underlying
debt. The mortgage splits the title in two parts: the legal
title, which becomes the mortgagee's, and the equitable
title, which the mortgagor retains". See Vee Jay Realty
Trust Co. v. DiCroce, 360 Mass. 751, 753 (1972); Negron v.
Gordon, 373 Mass. 199, 204 (1977). *"The purpose of vesting
legal title in the mortgagee is to secure the debt owed by
the mortgagor."* Krikorian v. Grafton Co-op. Bank, 312 Mass.
272, 274 (1942). Negron v. Gordon, supra 373 Mass. at 204.
"Although a mortgage vests title. that title is defeasible

and is an off-shoot of the underlying debt. "Neither the breach of the statutory condition nor a lapse of time subsequent thereto alters the rights of the parties in relation to the property." 28 M.E. Park & D. D. Park, Conveyancing, § 351 (1968). Goodwin v. Richardson, 11 Mass. 469, 472 (1814). "So long as it remains in possession, the mortgagor is regarded as the real owner", Way v. Mullett, 143 Mass. 49 (1886), "and it retains all incidents of ownership, not only as to all the world, but as to the mortgagee as well" Aragona v. Parrella, 325 Mass. 583 (1950). Therefore, the $200,000.00 question Defendant needs to answer is; where is the proof that New Century ever legally assigned Ms. Matt's mortgage and the underlying debt (Note) to the foreclosing trust.

83.    A holder of a promissory Note means the person in *"physical possession"* of a negotiable instrument that is either payable to bearer or an identified person that is in possession. Mass. G.L. c. 106 § 1-201(20). To qualify as a negotiable instrument, a promissory Note must contain an unconditional promise to pay a fixed amount of money, with or without interest or other charges described in the promise, if it is (1)payable to bearer or order at the time it is first issued or first comes into possession of a holder; (2) is payable on demand or at a definite time, and (3) does not state any other undertaking or instruction by the person promising payment to do any act in addition to

the payment of money, but the promise or order may contain
(i) an undertaking or power to give, maintain, or protect
collateral to secure payment, (ii) an authorization or power
to the holder to confess judgment or realize on or dispose
of collateral; (iii) a waiver of the benefit of any law
intended for the advantage or protection of an obligor.
Mass. G.L. c. 106 § 3-104(a) "Holder status would not
conferred on Defendant simply because the Plaintiffs' Note
is a negotiable instrument". The Galiastros' Note was
purportedly transferred from the original payee (Fremont as
"Lender"), to the foreclosing trust (through Defendant as
its "nominee"),. Therefore the negotiation of the
Galiastros' Note is necessary for the trust (through
Defendant as its "nominee") to achieve Holder status of the
Galiastros' Note ." See Morgan v. Bruce, 1993 WL 786892. A
proper negotiation of an instrument payable to an identified
person ("Fremont") requires the holder's written endorsement
on the instrument itself or on a separate piece of paper
that is firmly affixed to the promissory Note See Morgan at.
Defendant has only produced a Note payable to Fremont. The
above is the precise reason why production of
Defendant physical Note is necessary, and the reason that
Defendant (as "nominee" for the trust) lacks standing.

84.    Having established that where a mortgage is given to
       secure an underlying debt, as opposed to a non-recourse
       mortgage, when the foreclosing entity seeks to enforce the

power of sale in the borrower's mortgage contract upon
breach of condition of making payments on the Note, the
Defendant (as "nominee" for the assignee of the "Lender")
must show that it has rights to enforce the underlying Note.
As a promissory Note is a negotiable instrument, it has its
own rules as to the effectiveness of any purported
assignment. These rules are contained in Article 3 of the
Uniform Commercial Code, codified in Massachusetts under
G.L. c 106.

85.    When confronted with an issue where a transfer of a
Note that is "order paper", Massachusetts courts have
opined, "Article 3 provides that where a negotiable
instrument is payable to an identified person, the transfer
of the ownership of the instrument requires endorsement by
the holder. and transfer of possession of the instrument. In
Re: Gavin, 319 B.R. 27, 31 (quoting G.L. c. 106 § 3-201).
Article 3 also provides that an instrument is "transferred"
when it is delivered by the Holder for the purpose of giving
the recipient the right to enforce the instrument." Gavin at
31 (quoting G.L. c. 106 § 3-203(a». "Proper transfer of the
instrument vests in the recipient any rights of the
transferor to enforce the instrument". Gavin at 31 (quoting
G.L. c. 106 § 3-203("and the transferor cannot transfer
greater enforcement rights than it holds" (See Id.).

86.    In Gavin there was a question as to a Note specifically

indorsed to Fleet, which was being sought to be enforced by
a subsequent transferee. "With the Note in question payable
to Fleet, any assignment of ownership of the Note requires
transfer of possession of the physical Note." Gavin at 32.
The Gavin court went on to explain that there may be relief
or savings clause under Article 3 for a creditor not
currently in possession of properly endorsed Note. (Quoting
G.L. c.106 § 3-309) "Specifically, Article 3 provides that a
person who is not in possession of the instrument may
nonetheless enforce it, if the instrument has been lost,
destroyed, or stolen, and":

   a. The person was in possession of the instrument and
      entitled to enforce it when loss of possession
      occurred.

   b. The loss of possession was not the result of a transfer
      by the person or a lawful seizure of the instrument,
      and;

   c. The person cannot reasonably obtain possession of the
      instrument because the instrument was destroyed, its
      whereabouts cannot be determined, or it is in wrongful
      possession of an unknown person.

87.    Therefore an entity seeking to enforce rights under a
lost instrument must prove the terms of the instrument and
the person's right to enforce it (quoting G.L. c. 106 § 3-
309(b), and a court may not enter judgment in favor of the
person seeking enforcement unless it finds that the person
obligated to pay the instrument is adequately protected
against loss that might occur due to a claim by another
party seeking to enforce the instrument". (Id.). The Gavin

Case 1:10-cv-11621 Document 1 Filed 09/23/10 Page 28 of 70

court found that the Assignee seeking to enforce the terms
of the Note, (Premier) had produced the original Note made
payable to the originator (Fleet Bank), and also had
produced the subsequent assignment of the Note by Sovereign
to Premier. However Premier failed to provide the Assignment
between Fleet Bank and Sovereign. "Moreover, Premier failed
to produce either evidence of the endorsements required to
establish its ownership of the Note or substitute evidence
permitted under state law. To the contrary, Premier admitted
at trial and oral argument that it had no direct evidence of
the Assignment of the Note from Fleet to Sovereign. Absent
such evidence, Premier has failed to establish title to the
Note, and thus has no enforceable obligation against the
debtor." Gavin at page 32.

88.    Like Gavin, Defendants have failed to produce any
evidence of the indorsements required to establish the chain
of ownership of Ms. Matt's Note, nor has it produced any
physical Note whatsoever providing the authority for a
purported assignment of the Matt Note as an assignee of New
Century Mortgage Corporation, a business entity who had
ceased operations and was in fact bankrupt at the time of
this purported "assignment".

89.    As discussed above, if Defendants position is to
"conveniently" claim that the Ms. Matt's' Note is suddenly
"lost", under G.L. c. 106 § 3-309, Defendants *must* proffer

proof that it was entitled to enforce Ms. Matt's Note, and was in actual physical possession of Ms. Matt's physical Note at the time the Note was "lost".

90.     Under G.L. c. 106 § 3-309, this court may not enter judgment against Ms. Matt (under a "lost note" theory) "unless it finds that the person obligated to pay the instrument is adequately protected against loss that might occur due to a claim by another party seeking to enforce the instrument".

91.     Clearly, G.L. c. 183 § 20 also provides the right to a mortgagee to specifically state the conditions in an individual's mortgage contract that the parties bargained for in the transaction.

92.     Reviewing the Ms. Matt's security agreement, proffered as "evidence" by Defendants, at Paragraph One under the Uniform Covenants heading, describes the requirement of payment of the underlying Note. Further under the Non-Uniform Covenants heading at paragraph 22, describes the acceleration of the Note, and the power of sale clause that is directly tied to the underlying indebtedness.

93.     The only breach of condition in Ms. Matt's mortgage contract that HSBC states triggers the power of sale clause in her mortgage, is her "default" of the underlying

promissory Note. Therefore, HSBC must proffer evidence that it is entitled to claim ownership with the right to enforce her promissory Note. "In determining the rights of the plaintiff, the Note and mortgage are to be construed together" Strong v. Jackson 123 Mass. 60, 64.

94.     The foreclosing trust is what is known as a "Massachusetts Trust", a "for profit unincorporated business organization".

95.     Under the holding of Hecht v. Malley, 265 U.S. 144 (1923), these unincorporated business organizations are required to follow the terms the Trust with regards to the conveyance of the corpus (mortgage loans) to the Trust.

96.     The foreclosing Trust's governing instrument clearly states that Ms. Matt's loan (as well as the rest of the underlying mortgages) had to be assigned to the Trust be only one authorized party, the "Depositor". The governing instrument specifically identifies ACE Securities Corp., as the Depositor at pages 26 of the Prospectus, Page S-1 of the Prospectus Supplement, and Section 1 of the Pooling and Servicing Agreement.

97.     The Trust's governing instrument also states that Ms. Matt's loan was required to be assigned by the Depositor to the Trust on or prior to the "Closing Date". The Closing

Date is defined as "on or around June 29, 2005, at page S-1
of the Prospectus Supplement.

98.     Defendants proffer of the assignment of Ms. Matt's
mortgage uncontrovertibly states that <u>New Century</u> assigned
Ms. Matt's Note and mortgage to the Trust on <u>November 6,
2007</u>.

99.     Defendants <u>clearly circumvented the requirements</u> of the
Trust's governing instrument with regards to the conveyance
and assignment of the Matt loan to the Trust.

100.    At page S-152 of the Prospectus Supplement, the
governing instrument <u>anticipates the failure to convey</u> Ms.
Matt's Note and mortgage to the Trust governing instrument:

> On or prior to the Closing Date, the Trustee
> or the related Custodian on its behalf will
> review the Mortgage Loans and the Related
> Documents pursuant to the Custodial Agreement
> and, if any Mortgage Loan or Related Document
> is found to be defective in any material
> respect and such defect is not cured within
> 90 days following notification thereof to the
> Mortgage Loan Seller by the Trustee or the
> Servicer, the Mortgage Loan Seller will be
> obligated either to:
>
> (i) substitute for such Mortgage Loan a
> Qualified Substitute Mortgage Loan;
> however, such substitution is permitted only
> within two years of the Closing Date and may
> not be made unless an opinion of counsel is
> provided to the effect that such substitution
> will not disqualify any of the REMICs (as
> defined in the Pooling and Servicing
> Agreement) as a REMIC or result in a
> prohibited transaction tax under the Code; or
>
> (ii) purchase such Mortgage Loan at a price

(the "*Purchase Price*") equal to the
outstanding principal balance of such
Mortgage Loan as of the date of purchase,
plus all accrued and unpaid interest
thereon, computed at the Mortgage Rate
through the end of the calendar month in
which the purchase is effected, plus the
amount of any unpaid Servicing Fees or
unreimbursed P&I Advances and servicing
advances made by the Interim Servicer or
a Servicer plus all unreimbursed costs and
damages incurred by the trust and the
Trustee in connection with any violation by
any such Mortgage Loan of any predatory or
abusive lending law. The Purchase Price will
be required to be
remitted to the Interim Servicer or related
Servicer for deposit in the related
Collection Account (as defined herein) for
remittance to the Securities Administrator
prior to the next succeeding Distribution
Date after such obligation arises. **The
obligation of the Mortgage Loan Seller to
repurchase or substitute for a Deleted
Mortgage Loan (as defined herein) is the sole
remedy regarding any defects in the Mortgage
Loans and Related Documents available to
the certificateholders.**

101. Uncontrovertibly, the assignment of the Matt loan was
not made in accordance with the terms of the trust. Under
860D of the United States Tax Code (Real Estate Mortgage
Investment Conduit provision), there could not be any
additional assignments of mortgages to the Trust after the
"Closing Date". The result is that the assignment of the
Matt loan is fatally defective as it was not assigned to the
Trust under its terms. See <u>Hecht v, Malley</u>, 265 U.S. 144
(1923).

102. The Trust's governing instrument uncontrovertibly

anticipates such a catastrophic failure to assign Ms. Matt's
Note to the Trust according to its terms, and that is to
provide the certificateholders the **sole remedy** for this
defalcation is to seek recourse as against the "Mortgage
Loan Seller", identified in the governing instrument as <u>DB
Structured Products, Inc.</u>, not Ms. Matt.

103.    On information and belief, the Legal Notice provided to
Ms. Matt pursuant to G.L. c. 244 § 14 is not valid because
at the time it was sent, HSBC was not a proper assignee and
holder of Ms. Matt's mortgage, and therefore had no power to
act on behalf of the mortgagee under the statute. <u>See</u>
<u>Bottomly v. Kabchinick</u>, 13 Mass.App.Ct. 480, 434, 434 N.E.2d
667 (1982).

104.    HSBC cannot conduct a valid foreclosure auction of Ms.
Matt's residence under Massachusetts' law.

105.    HSBC's foreclosure, if allowed to proceed would cause
Ms. Matt irreparable harm. "real estate has long been
thought unique, and thus, injuries to real estate interests
frequently come within the realm of the chancellor." <u>K-Mart
Corp. v. Oriental Plaza, Inc.</u> 875 F.2d 907, 914 (1st
Cir.1989).

106.    Defendant has approximately $400,000.00 in equity in
the property at issue before this court.

Case 1:10-cv-11621 Document 1 Filed 09/23/10 Page 34 of 70

107.   The balance of the hardships tips <u>decidedly in favor of
Ms. Matt</u>, because absent injunctive relief, she will lose
her primary residence, and will lose the substantial equity
she has accumulated, and/or rights to raise claims and
defenses to the enforcement of the mortgage set forth
hereunder.

108.   The public interest is furthered by the granting of the
requested preliminary injunction, as it acknowledges the
importance of maintaining a home as the central component of
the family and its safety, shelter and nourishment.

109.   HSBC will suffer no harm from the issuance of the
requested preliminary injunction, as it is adequately
secured, due to the presence of over $400,000.00 in equity
possessed by Ms. Matt.

110.   Absent injunctive relief, there is a substantial
likelihood that neither HSBC, nor any other Defendant would
conform its conduct in accordance with the mandates of
Massachusetts law.

**COUNT II: CIVIL RICO**
**(as to all Defendants)**

111.   Ms. Matt realleges all prior paragraphs as if set out
here in full.

Case 1:10-cv-11621 Document 1 Filed 09/23/10 Page 35 of 70

112.    The Racketeer Influenced and Corrupt Organizations Act
    ("RICO") prohibits certain conduct involving a "pattern of
    racketeering activity" 18 U.S.C. §1962, and makes a private
    right of action available to "any person injured in his
    business or property by reason of a violation of RICO's
    substantive restrictions, 18 U.S.C. §1964(c), provided that
    the alleged violation was the proximate cause of the injury,
    Holmes V. Securities Investor Protection Corporation, 503
    U.S. 258, 268 (1992).

113.    Proper interpretation of 18 U.S.C. §1964(c) requires
    consideration of the statutory history, which revealed that
    "Congress modeled §1964(c) on the civil action provision of
    federal antitrust laws, §4 of the Clayton Act" Holmes at
    267. In Associated Gen. Contractors of Cal., Inc. v.
    Carpenters, 459 U.S. 519 (1983), the United States Supreme
    Court held that a Plaintiff's right to sue under §4 required
    a showing that the Defendant's violation was not only a 'but
    for' cause of his injury, but was the proximate cause as
    well" Holmes at 268 (Citing Associated Gen. Contractors,
    supra at 534).

114.    RICO's substantive liability provisions are found in 18
    U.S.C. §1962, which has four labeled sections; (a), (b),
    (c), and (d).

115.    §1962(a) generally makes it unlawful for a person to use an enterprise to launder money generated by a pattern of racketeering activity, Lightening Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188 (3d. Cir. 1993).

116.    §1962(b) makes it unlawful for a person to acquire or maintain an interest in an enterprise through a pattern of racketeering activity.

117.    §1962(c) prohibits any Defendant person from operating or managing an enterprise through a pattern of racketeering activity. The elements necessary to establish a §1962(c) claim, the Plaintiff must prove

    a. That a Defendant person (defined by statute to include a business organization).

    b. was employed by or associated with an enterprise.

    c. was engaged in, or affected interstate commerce, and

    d. that Defendant person operated or managed the enterprise,

    e. through a pattern of,

    f. racketeering activity, and

    g. the Plaintiff was injured in its business or property by reason of the pattern of racketeering activity.

118.    As to the first element, all of the Defendants are "persons" as defined under the RICO Act.

119.   Next, to establish liability under any subsection of §1962, a Plaintiff must allege the existence of an "enterprise".

120.   In <u>Boyle v. United States</u>, 129 S.Ct. 2237 (2009), the United States Supreme Court clarified the characteristics of an actionable "association in fact enterprise". The Supreme Court stated that an association in fact enterprise possesses three characteristics; (1) a purpose, (2) relationships among those associated with the enterprise, (3) longevity sufficient to permit these 'associates' to pursue the enterprise's purpose. The Supreme Court  further explained:

> "Such a group need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, noting in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique, for example a group that does nothing but engage in extortion through old fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach"

<u>Boyle</u> at 2245-2246. See also <u>Jay E. Hayden Foundation v. First Neighbor Bank, N.A.</u>, 2010 WL 2485679 *6 (7th Cir.2010).

Case 1:10-cv-11621   Document 1   Filed 09/23/10   Page 38 of 70

121.    Defendants' enterprise was the procurement and sales of
    mortgage loan products for ultimate sale into the secondary
    market. Defendants were involved in two different front of
    the mortgage market:

    a. first Defendant were engaged in, or affected interstate
        commerce, through solicitation of mortgage borrowers,

    b. second  Defendants  are  intimately  involved  in  the
        processes involved with the securitization of mortgage
        loans  to  be  sold  as  "investments"  to  investors  who
        ultimately fund the underlying mortgage loans, leaving
        Defendants  completely  insulated  from  credit  default
        risk of foreclosure. Yet at the same time through the
        deceptive   acts   undertaken   and   directed   by   the
        enterprise   towards   both   ends   of   the   mortgage
        securitization  spectrum,  Defendants  enterprise  was
        intimately involved with interstate commerce.

122.    Under information and belief, Defendants represent an
    "association in fact enterprise", as they are a group that
    was formed to carry out illegal acts through the use of the
    United States wires and Postal System. Although there is no
    hierarchal structure or chain of command, and Members of the
    group may not have fixed roles; and different members
    perform different roles at different times, it was (and
    still is) in existence to carry out its purpose.

Case 1:10-cv-11621 Document 1 Filed 09/23/10 Page 39 of 70

123.    Defendants 'operated and managed', the enterprise.

124.    §1962(c), also requires that the Defendants conduct or
participate, directly or indirectly, in the conduct of such
enterprise's affairs. The United States Supreme Court has
interpreted this language to mean that a Defendant must
'operate and manage' the enterprise, <u>Reeves v. Ernst &
Young</u>, 507 U.S. 170, 183 (1993).

125.    Under information and belief, Defendants all
participated in a joint enterprise to willfully induce Ms.
Matt to enter into a loan transaction that Defendants knew
or should have known would result in default. Each Defendant
may have had different roles in this enterprise, however it
continues today through the enterprise's attempt to
foreclose on Ms. Matt's home without any indicium of
ownership of this obligation. Defendants have all received
significant remuneration from these actions. The United
Supreme Court has spoken to the meaning of 'to manage or
operate' an enterprise:

> "An enterprise is 'operated' not just by upper
> management, but also by lower-rung participants in the
> enterprise who are under the direction of upper
> management. An enterprise also may be 'operated' or
> 'managed' by others associated with the enterprise who
> exert control over it as, for example by bribery."
> <u>Reeves</u> at 184.

126.    In <u>H.J. Inc. v. Northwestern Bell</u>, 492 U.S. 229 (1989),

The United States Supreme Court determined that the factors

of relatedness and continuity combine to produce a "pattern

of racketeering". As a result of the U.S. Supreme Court's

decision in <u>H.J.,Inc.</u>, the statutory definition of "pattern"

(18 U.S.C. § 1961(5) has been rendered meaningless.

127.    "To be related, the criminal actions that form the

pattern must "have the same or similar purposes, results,

participants, victims, or methods of commission, or

otherwise are interrelated by distinguishing

characteristics." <u>H.J. Inc</u> 492 U.S. at 240.

128.    Here, all of the Defendants sought the same result,

which was the ultimate purpose of their concerted actions;

to induce Ms. Matt to undertake the mortgage loan from

Northeast Mortgage Corporation (which was then "assigned" to

New Century on the very same day). Under information and

belief, these same Defendants are currently carrying out

this ongoing enterprise against other residents of the

Commonwealth, as well as nationally.

129.    "A party alleging RICO violations may demonstrate

continuity over a closed period by proving a series of

related predicates extending over a substantial period of

time. <u>H.J. Inc.</u>, 492 U.S at 242.

130.    Open ended continuity exists when the criminal conduct
   is specifically threatened to be repeated or to extend
   indefinitely in the future. <u>H.J. Inc</u>, at 242-243.

131.    Defendants in the action before this court meet both
   tests, as the specific conduct demonstrated here was carried
   out by a series of <u>related predicates</u>, such as:

   a. Under information and belief, the enterprise's
      inducement of Ms. Matt to sign the mortgage contract
      based upon false assertions by Northeast,

   b. the failure to disclose that Northeast was only acting
      for New Century Mortgage Corporation in the origination
      of the loan,

   c. the failure of New Century to assign Ms. Matt's loan to
      HSBC, and,

   d. Under information and belief, New Century's (or the
      enterprise's) attempt to cover up such defalcation by
      placing a fraudulent assignment of mortgage upon the
      Norfolk Registry of Deeds, in order to carry out the
      enterprise's illegal purpose through the illegally
      foreclosure of Ms. Matt's residence.

   e. Under information and belief, such conduct by the
      enterprise is "threatened to be repeated or to extend

indefinitely into the future", as the enterprise is
involved in many other such schemes involving other
borrowers in the Commonwealth.

132.   A RICO claim may be predicated on not only numerous
criminal violations, but also violations of certain state
criminal laws. With regards to state crimes, the RICO Act
states that a violation can be predicated upon, "any act or
threat involving murder, kidnapping, gambling, arson,
robbery, bribery, extortion, illegal immigration, obscenity,
obstruction of justice, interstate transport of stolen
property, and criminal infringement of intellectual property
rights.

133.   A RICO claim may also be predicated upon state criminal
laws. The RICO Act states that a violation may be predicated
upon, "any act or threat involving murder, kidnapping,
gambling, arson, robbery, bribery, extortion which is
chargeable under State law and punishable by imprisonment of
more than one year."

134.   18 U.S.C. §§ 1341, 1343, state that it is a criminal
act to for anyone to use the U.S. Mail or wires to advance a
scheme to defraud. The fraudulent statements themselves need
not be transmitted by mail or wire, it is only required that
that the scheme to defraud be advanced by the U.S. Mail or
wires, See 18 U.S.C. §§ 1341, 1343.

135.     Under information and belief, the scheme to defraud Ms.
Matt that was advanced by the enterprise (consisting of the
named Defendants), made extensive use of the United States
Mails and wires to advance it purpose of inducing Ms. Matt
to undertake the mortgage loan transaction at issue.
Further, these uses of the U.S. Mails and wires to advance
the enterprise are currently ongoing.

136.     The deceptive conduct that forms the basis of Ms.
Matt's RICO claim related to the criminal use of the U.S.
Mails and wires, relates to the fact that she was
fraudulently induced to undertake the mortgage loan in
question, and further that correspondence was sent to her
through the U.S. Mails for this purpose. Further, Defendants
continued to send Ms. Matt mortgage payment requests, when
evidence proffered by Defendants fails to identify that any
of the Defendants actually are entitled to any ownership
claim to Ms. Mate's mortgage Note.

137.     Therefore, Defendants have defrauded Ms. Matt out of
monies wrongfully sent to Defendants for a loan that
Defendants do not actually have any legal or equitable
ownership in whatsoever.

138.     18 U.S.C. § 1344. Bank fraud

    Whoever knowingly executes, or attempts to
    execute, a scheme or artifice—

    (1)  to defraud a financial institution; or

**(2)** to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

139.    Under 18 U.S.C. § 1344(2), bank fraud arises even if a victim is not a bank and even if the bank did not lose any of its own property pursuant to a scheme to defraud. Bank fraud occurs whenever a scheme to defraud enables the perpetrators to obtain any funds "under the custody and control of" a bank.

140.    Therefore, under information and belief, Defendants scheme to defraud Ms. Matt into procuring the mortgage loan transaction, as well as its acquisition of funds that Ms. Matt had placed in the "custody and control of" her lending institution, includes the predicate act of bank fraud, and thus Ms. Matt has satisfied all of the elements to establish her RICO claim as against Defendants.

141.    Therefore based upon the foregoing, Ms. Matt has suffered a direct injury that was proximately caused by the furtherance of the enterprise, which was carried out through the use of the United States Mail and wires.

142.    An additional predicate act committed by Defendants was the fraudulent inducement of Ms. Matt to relinquish funds that were in the custody and control of her lending

institution.

143.    Ms. Matt further argues that another predicate act is
an integral ongoing predicate act being committed by the
enterprise, namely extortion, in that the enterprise makes
continuing threats directed towards Ms. Matt to pay a
legally unenforceable obligation, and failure to do will
result in the sale of her home. As a home is the most
significant asset, and a critical component of maintaining
family unit integretiy, borrowers (Ms. Matt included) will
do anything to prevent this horrific occurance. Seizing upon
this fear, BAC (as the servicing member of the enterprise)
commonly makes threats that it will foreclose if Ms. Matt
does not comply with the demand for payment of this legally
unenforceable debt. These threats are akin to Tony Soprano
"making an offer that you cant refuse". One can only imagine
a H&B Louisville Slugger being brandished about while these
phone calls are being made to borrowers.

144.    Ms. Matt seeks all damages allowable to her under the
RICO Act, including, but not limited to, triple damages,
attorney fees, and costs.

### COUNT III:<u>Respondeat Superior Liability</u>
### (As against all defendants)

145.    Ms. Matt realleges all prior paragraphs as if set out
here in full.

Case 1:10-cv-11621 Document 1 Filed 09/23/10 Page 46 of 70

146.     The Defendant HSBC as Trustee, a Defendant in this
     action, hired, directed, or controlled the actions of Bank
     of America Home Loans as successor in interest to
     Countrywide Home Loans in its capacity as mortgage servicer
     of the mortgage loan in this case, as well as its agents and
     employees. Bank of America Home Loans hired both Stanton and
     Davis and Harmon Law Offices, P.C. to carry out the
     instructions of HSBC to foreclose in this matter, in
     furtherance of the enterprise.

147.     Bank of America Home Loans serves at the pleasure of
     HSBC and the Trust and/or is a part of a joint venture with
     the Trust and Trustee in this action. Bank of America and
     various fictitious Defendants to this action are alleged,
     under information and belief, to be engaged in a civil
     conspiracy to engage in conduct which is unlawful for the
     purpose of unjustly enriching the members or participants in
     the joint venture or civil conspiracy.

148.     HSBC is liable in tort for all the wrongful actions of
     its agents, employees, joint venturers, or servants, Bank of
     America, and its servants Stanton and Davis and Harmon Law
     Offices, P.C..

149.     As a result of the wrongful actions described herein
     Ms. Matt has been injured and damaged and claims all damages
     available to her under federal and Massachusetts state laws

for these actions.

### COUNT IV: VIOLATION OF CHAPTER 93A AND ITS IMPLEMENTING REGULATIONS
### (As against all Defendants)

150.   Ms. Matt repeats and realleges all paragraphs above as if set forth fully herein.

151.   Northeast Mortgage Corporation has violated G.L. c. 93A and its implementing regulations by utilizing terms and practices that were unfair, deceptive, and/or unconscionable. These violations included, without limitation:

   a.   Employing a 'bait and switch' strategy Northeast Mortgage Company offered Ms. Matt a mortgage on more favorable terms prior to closing, and then offering a different mortgage loan product at closing in violation of 940 C.M.R. §§ 8.04(4) and 8.06(1) and c. 93A § 2;

   b.   Northeast Mortgage Corporation as the enterprise's agent, promising to offer Ms. Matt's mortgage on more favorable terms to induce her to close the loan in violation of 940 C.M.R. § 8.06(1) and c. 93A § 2;

   c.   Making a loan on terms that were unfair and deceptive in light of its hidden advantages to

Northeast Mortgage Corporation due to its hidden costs to Ms. Matt, including, without limitation, using an unjustified thousand dollar increase in broker's fees from its original disclosure in its good faith estimate as a means to create a hidden advantage in the origination of Ms. Matt's loan in violation of 940 C.M.R. §§ 3.04, 3.05, 3.13, and 6.05, M.G.L. c. 183 § 63 and c. 93A § 2;

d.    Providing a confusing variable rate provision in the loan designed to protect New Century if rates increase from those in place when the loan is made without providing a benefit to Ms. Matt when rates decline; and

e.    Failing to make disclosures that comply with 940 C.M.R. § 8.05(2).

152.    Northeast Mortgage Corporation's conduct was willful or knowing within the meaning of c. 93A, § 2.

153.    Ms. Matt was injured and suffered damages by virtue of these violations.

154.    The demand letter requirement under c. 93A § 9 does not apply to HSBC or the other Defendants because Ms. Matt is

Case 1:10-cv-11621 Document 1 Filed 09/23/10 Page 49 of 70

asserting her claims defensively against the foreclosure
action.

155.   The demand letter requirement under c. 93A § 9 does not
apply to HSBC because HSBC does not maintain a place of
business and/or does not keep assets within the
Commonwealth.

156.   The demand letter requirement under c. 93A § 9 does not
apply to HSBC, because Ms. Matt has rescinded her mortgage
loan under G.L. c. 140D §10 by way of a claim in recoupment.

157.   Under the holding of In re Fidler 210 B.R. 411 (Bankr.
D.Mass. 1997), Ms. Matt's right to rescind as a claim in
recoupment as a defense to foreclosure has no statute of
limitations.  Under G.L. c. 140D §34, a violation of G.L. c.
140D is an automatic violation of G,L, c. 93A.

### COUNT V: RESCISSION BY WAY OF RECOUPMENT
### UNDER G.L. c. 140 D
### (as to all Defendants)

158.   Ms. Matt realleges all prior paragraphs as if set out
here in full.

159.   The federal Truth and Lending Act was enacted in 1968
to regulate disclosure of the terms of consumer credit

transactions and to "aid the unsophisticated consumer so
that he or she would not be easily misled as to the total
costs of financing." Thomka v. A.Z. Chevrolet, Inc., 619
F.2d 246, 248 (3rd Cir. 1980); Mourning v. Family
Publications Service, Inc., 411 U.S. 356, 363-369, 93 S.Ct.
1652, 1657-60, 36 L.Ed,2d 318 (1973).

160.   By requiring a set of uniform disclosures of credit
terms, the Act allows consumers to compare different
financing options and their costs. 15 U.S.C. §1601; Ford
Motor Company v. Millhollin, U.S.555,559 (1980). Prior to
its enactment, consumers had no easy way to compare various
credit options because creditors were not required to use a
uniform method of calculating interest.

161.   The Massachusetts version of TILA is the Consumer
Credit Cost Disclosure Act ("CCCDA"), G.L. c. 140D.

162.   The CCDA is virtually identical to the federal law with
respect to required disclosures and remedies, Mayo v. Key
Financial Services, Inc., 424 Mass. 862, 678 N.E.2d 1311
(1997). As such, the Court of Appeals in Bizer v. Global
Financial Services, Inc. 654 F.2d 1, 2 (1st Cir. 1981 treated
the two laws (and the body of case law interpreting them)
essentially as one, concluding that "this interplay [between
the state and federal acts] will with minor exceptions not

require separate analysis of the two acts and we will rely

where they do not differ on prior analysis of the more

widely considered federal act"

163. The Supreme Judicial Court has held that the CCCDA must

be liberally construed in favor of protecting consumers,

Shepard v. Finance Associates of Auburn, Inc., 316 N.E. 2d

997; 395 Mass 182 (1974) See Bizer v. Globe Finance

Servicers, Inc. 654 F.2d 1 (1st Cir. 1981) ("courts have

consistently recognized [that] the act is intended to

balance scales thought to be weighed in favor of lenders and

thus is to be construed in favor of borrowers").

164. To encourage compliance, violations are measured by a

strict liability standard: "strict liability in the sense

that absolute compliance is required and even technical

violations will form the basis for liability." Mayo v. Key

Financial Services, Inc, 424 Mass. 862, 678 N.E. 2d 1311,

1313 (1997); Gibbons v. Interbank Funding Group, 208 F.R.D.

278, 282 (9th Cir. 2002) ("To insure that the consumer is

protected…[TILA and Regulation Z must] be absolutely

complied with and strictly enforced.") Purtle v. Eldrich

Auto Sales, Inc. 91 F.3d 797, 801 (6th Cir. 1996).(holding

that TILA imposes strict liability); Shepard v. Quality

Siding & Window Factory, Inc., 730 F.Supp.1295, 1299 (D.

Del. 1990) (citing In re McElvany, 98  B.R. 237, 240 (Bankr.
W.D. Pa 1989).

165.    A creditor who fails to comply with the statute in any
respect is liable to the consumer under the statute,
regardless of the nature of the violation or the creditor's
intent. Thomka v. A.Z. Chevrolet Inc., 619 F.2d 246,249-250
(3rd Cir. 1980). The First Court of Appeals has unequivocally
stated that any violation of the statute, regardless of the
technical nature of the violation, must result in a finding
of liability against the lender. Bizier v Global Financial,
Services Inc., 654 2d 1, 2 (1st Cir. 1981) (TILA disclosure
which is inaccurate even in technical respects is a
violation). See also Smith v. Cash  Store Mgmt., 195 F.3d.
325, 328 (7th Cir. 1999) ("Subject to narrow exceptions,
'hyper technicality' reigns in the application of TILA"),;
Shroder v. Suburban Coastal Corp., 729 F. 2d 1371, 1380 (11th
Cir. 1984) ("Liability will flow from even minute deviations
from requirements"); Grant v. Imperial Motors 539 F.2d 506,
510 (5th Cir. 1976) ("Once the court finds a violation [of
TILA],no matter how technical, it has no discretion with
respect to the imposition of liability.").

166.    The Massachusetts Consumer Credit Cost Disclosure Act
("MCCCDA", G.L. c.140D) subjects violators to claims for

statutory damages, actual damages and attorneys' fees for disclosure violations. G.L. c. 140D § 32.

167. In addition, where a non-purchase money security interest is taken in the borrower's home (as in Ms. Matt's Home Equity Loan), the borrower has the unqualified right to "rescind," or cancel the loan for three days after the transaction.

168. A creditors failure to accurately disclose this right to rescind gives the borrower an extended right to rescind the transaction G.L.c. 140D§10(a). (The right to rescind extends for three (3) years under the federal statute (15 USC §1635(1), and four (4) years under G.L. c. 140D §10(f)

169. In states with non-judicial foreclosure systems (like Massachusetts), prior to the 1995 amendments, the question arose for a consumer who had the right to cancel as to whether rescission by recoupment was available where the creditor is not required to go to court.

170. To stop an extrajudicial foreclosure, a debtor must be the one to file an "affirmative" action. While the matter was apparently not addressed in case law in the TILA context, when other defenses to foreclosure were at issue,

some courts recognized that contesting a non-judicial
foreclosure is just as defensive as contesting a judicial
foreclosure, and allowed the homeowner to raise otherwise
time barred claims. See Swayze v. Ameriquest Mortgage Co.,
No. 1:03-cv-733-WSD (N.D. Ga. Feb 16, 2005). However the
1995 amendments, by applying the defensive rescission
standards in both situations, clearly specify that consumers
TILA rescission rights do not depend upon the happenstance
of whether they live in a judicial or non-judicial
foreclosure state. 15 U.S.C. § 1635(i)(1),(2).

171.    While assignees are only liable for statutory damages
for TILA violations which are apparent on the face of the
loan documents assigned (15 U.S.C. § 1641(c), assignees are
subject to the rescission right to the same extent as the
original creditor Belini v. Washington Mutual Bank, 412 F.3rd
17 (1st Cir. 2005).

172.    Attorney fees are available in rescission cases. See
Belini v.Washington Mutual Bank 412 F.3rd 17.

173.    The most important aspect of TILA's extended rescission
right for consumers is its value as a defense to
foreclosure.

174.    If the transaction is subject to the rescission right,

and there are valid grounds for exercising the extended right to rescind, rescission is a complete defense to foreclosure. <u>Randall v. Bank One</u> (In re Randall), 358 B.R. 145, 158 (Bankr. E.D. Pa. 2006).

175. Often debtors realize they have a right to rescind only when they are propelled by a foreclosure case to consult an attorney.

176. In <u>Beach v. Ocwen Federal Bank</u> 523 U.S. 410, 118 S.Ct. 1408 (1998), traditional federal and state common law principles of recoupment allowed TILA rescission past the three year period when raised as a defense to a foreclosure action, or in bankruptcy in a response to a lender's proof of claim. <u>Botelho v. Citicorp Mortgage, Inc</u> (In re Botelho), 195 B.R. 558 (Bankr. D. Mass.1996); aff'd No. 96-12279-EFH (D. Mass Mar. 7, 1997).

177. "Recoupment" is in the nature of a defense arising out of some feature of the transaction upon which Plaintiff's action is grounded. Such a defense is never barred by the statute of limitations as long as the main action itself is timely". <u>U.S. v.Dalm</u>, 494 U.S. 596, 599.

178. In <u>Beach v. Ocwen</u>, the Court gave a nod to an exception to the three year extended right to rescission in a cryptic footnote which states: "Since there is no claim before us

that Florida law purports to provide any right to rescind
defensively on the grounds relevant under the Act, we have
no occasion to explore how state recoupment law might work
when raised in a foreclosure proceeding outside the three-
year rule." Beach, 140 L. Ed. 2d at 566 n.6.

179.    The holding in Beach was applied in Massachusetts in
Fidler v. Central Coop Bank (In re Fidler) 226 B.R. 734
(Bankr. D. Mass. 1998). (See Exhibit A).

180.    Massachusetts unequivocally adopted the view allowing
rescission by recoupment under the Massachusetts Consumer
Credit Cost Disclosure Act., G.L. c. 140 D. The Fidler
Court noted that the limitations period in the state statute
was not identical to that of TILA (4 year right to rescind),
and in any event the interpretation of the state statute was
a matter of state law. "Even if this case was governed by
TILA, §1635(i)(3), which provides that '[n]othing in this
subsection affects a consumers right to rescission in
recoupment under State law', would direct my inquiry to [the
Massachusetts TIL-type statute]and other Massachusetts law
concerning recoupment." Fidler, 226 B.R. at 736 n.6.

181.    The creditor is required to provide each borrower with
two copies of a notice to cancel, which clearly and
conspicuously discloses the right to rescind. G.L. C. 140D

§10(a); 209 C.M.R. § 32.23(2)(b). Failure to accurately describe the effects of rescission in a Notice of Right to Cancel is a material violation of TILA, which entitles the borrower to rescind the transaction <u>Radish v. AIB Mortgage Co.</u>, 16 F. 3d 1142, 1144 (11th Cir. 1994); Cf. <u>Bizier v. Boston Globe Financial Services</u>, 654 F.2d 1, 2 (1st Cir. 1981).(TILA disclosure which is inaccurate even in a technical respect is a violation).

182. Reviewing Ms. Matt's closing documents reveals that she did not receive the required copies of the Notice of the Right to Cancel at closing that "clearly and conspicuously" discloses her right to "rescind" the mortgage contract. Nor did Ms. Matt receive the required copies of the Truth In Lending Disclosure statement at closing.

183. Further the closing attorney never had her signature, notarized on an affidavit where she fraudulently stated that she provided all material disclosures to Ms. Matt at closing. (even though the document itself clearly required that the closing attorney do so).

184. Ms Matt is exercising her right to rescind defensively as a shield to foreclosure as a claim in recoupment, and therefore under the holdings of <u>Beach v. Ocwen</u>, <u>Botelho</u>, and <u>Fidler</u>, she has an unlimited period of time to exercise her

extended right to rescind.

185.    Ms. Matt was clearly not provided with the necessary

disclosure documents at closing.

186.    Due to Defendant Northeast Mortgage Corporation and

Attorney Laura Tomasello's gravely deficient failure to

provide said documents, Ms. Matt is entitled to rescind her

mortgage contract.

187.    Ms. Matt has rescinded her loan.

188.    Ms. Matt requests that this court issue a ruling,

officially granting her rescission of the offending mortgage

loan transaction currently before this court.

## COUNT VI: <u>BREACH OF CONTRACT</u>
**(As against Northeast Mortgage Corporation, New Century,Mortgage
Corporation, HSBC, DB Structured Products, Ace Securities Corp.)**

189.    Ms. Matt repeats and realleges all paragraphs above as

if set forth fully herein.

190.    New Century Mortgage Corporation, using Northeast

Mortgage Corporation as its agent, offered Ms. Matt

different terms in its oral and written disclosures than the

ones it offered at closing.

191.    To the extent that Northeast Mortgage Corporation

offered terms to Ms. Consumer prior to closing, Northeast

Mortgage Corporation formed contracts with Ms. Matt to

provide those promised terms.

192.    Promised terms included, without limitation: lower

monthly payments and a better interest rate.

193.    By delivering different terms at closing than the ones

initially promised, Northeast Mortgage Corporation breached

its contracts with Ms. Consumer.

194.    Northeast Mortgage Corporation's conduct caused Ms.

Matt irreparable harm including, without limitation,

increasing the amount of monthly payments owed to

unaffordable levels thereby putting her at imminent risk of

foreclosure.

195.    Northeast Mortgage Corporation's conduct increased the

cost of the loan to the Ms. Consumer.

196.    Ms. Matt is therefore entitled to damages and equitable

remedies for Northeast Mortgage Corporation's breach of the

loan contract.

**COUNT VII**: <u>INTENTIONAL MISREPRESENTATION</u>
(As against Northeast Mortgage Corporation, New Century,Mortgage
Corporation, HSBC, DB Structured Products, Ace Securities Corp.)

Case 1:10-cv-11621 Document 1 Filed 09/23/10 Page 60 of 70

197.    Ms. Matt repeats and realleges all paragraphs above as
   if set forth fully herein.

198.    Northeast Mortgage Corporation made misrepresentations
   to Ms. Matt, upon which Ms. Consumer relied to her
   detriment.

199.    Northeast Mortgage Corporation's misrepresentations
   included, without limitation:

   a. making preliminary oral and written disclosures
      pertaining to the settlement charges of the loan and;

   b. providing Ms. Matt's a loan at closing that contained
      significantly higher closing costs, higher interest
      rates and monthly payments than what Ms. Matt had
      originally bargained for.

200.    Northeast Mortgage Corporation made these
   misrepresentations to induce Ms. Consumer to enter into
   refinancing agreements with them.

201.    Northeast Mortgage Corporation's practices caused Ms.
   Matt harm including, without limitation, increasing the
   amount of monthly payments owed to an unaffordable level
   thereby putting Ms. Matt at imminent risk of foreclosure.

202.   Ms. Matt is entitled to damages and equitable remedies
   for Northeast Mortgage Corporation's intentional
   misrepresentations.

**COUNT VIII:** INTENTIONAL MISREPRESENTATION
(As against Bank of America / Countrywide Home Loans)

203.   Ms. Matt realleges all prior paragraphs as if set out
   here in full

204.   Countrywide Home Loans made statements intended to
   induce Ms. Matt believe that Countrywide was in fact
   seriously considering Ms. Matt's request for help with her
   mortgage.

205.   While Countrywide was assuring Ms. Matt that she was
   eligible for a loan modification, it simultaneously was
   instructing its counsel to "fire up the meat grinder" to
   eviscerate Ms. Matt's interest in her residence.

206.   Based upon Countrywide's false statements that they
   were intending to modify Ms. Matt's loan, Ms. Matt
   liquidated her life savings in her desperation to save her
   family's home.

207.   Countrywide Home Loans willfully made these statements
   to Ms. Matt with the knowledge of their falsity.

208.    Ms. Matt relied on these statements by Countrywide Home
    Loans, and would not have acted but for these
    representations.

209.    Ms Matt has suffered severe financial damage, through
    the forced liquidation of her life savings in her retirement
    account) that was proximately cause by the actions of
    Countrywide Home Loans and BAC Home Loans.

210.    Ms. Matt will prove her damages at trial.

### COUNT IV: CIVIL CONSPIRACY
### (As to all Defendants)

211.    Ms. Matt realleges all prior paragraphs as if set out
    here in full

212.    Massachusetts recognizes two types of Civil Conspiracy.

213.    "The first type is commonly known as 'true conspiracy',
    which occurs when the conspirators, acting in unison,
    exercise a peculiar power of coercion over the Plaintiff
    that they would not have had they acted alone" See Metro.
    Prop. And Cas. Ins. Co. v. Boston Regional Physical Therapy,
    Inc. F. Supp. 2d 199, 202 (D. Mass. 2008).

214.    The second form of conspiracy recognized in

Massachusetts is the tort-based civil conspiracy "'more akin to a theory of common law joint liability in tort… Id.

215.    For liability to attach with respect to the second form of conspiracy there must be an agreement between two or more people to do a wrongful act and proof of some tortuous act in furtherance of the agreement. Id.

216.    This second type of civil conspiracy derives from concerted action, 'whereby liability is imposed on one individual for the tort of another." Kurker v. Hill, 689 N.E.2d 833, 836 (Mass App. Ct. 1998 (Citing Aetna, 43 F.3d at 1564).

217.    By acting in unison, Defendants exercised a peculiar power of coercion over Ms. Matt, in that Harmon as attorney for HSBC prepared and filed all relevant documents with reference to the attempted wrongful foreclosure of the Matt mortgage, something HSBC could not have accomplished on its own.

218.    Defendants Northeast Mortgage Corporation and New Century Mortgage corporation induced Ms. Matt to undertake the mortgage loan in question, something HSBC couldnot have accomplished on its own.

219.    Defendants Countrywide Home Loans (now BAC Home Loans)

billed and serviced Ms. Matt's loan for an entity that has
no legal right to any claim of ownership of Ms, Matt's loan,
something HSBC could not have accomplished on its own.
Countrywide Home Loans / BAC is also directing the illegal
foreclosure action through Harmon Law, something HSBC could
not have accomplished on its own.

220.    Therefore Defendants meet the requirements to establish
the first type of conspiracy recognized in the Commonwealth.

221.    The actions of Defendants appear to imply they acted in
concert to induce Ms. Matt to enter into the mortgage loan
transaction at issue before this court. Further all
Defendants have acted in concert to seek wrongful collection
on a mortgage loan that is not owned by any of the
Defendants.

222.    There was an agreement between at least 2 parties (some
undisclosed) to perform an act that is at least malum
prohibitum, and the tortuous act would be the wrongful
collection, and conversion of, Ms. Matt's monthly mortgage
payments and the current foreclosure action, based upon the
fact that all parties acted with scienter that Defendants
lack standing to claim ownership of Ms. Matt's Note, or
mortgage, and therefore lacked the legal right to foreclose.

223.    The affirmative steps in the furtherance of the

conspiracy were Northeast Mortgage Corporation's fraudulent inducement of Ms. Matt to undertake the mortgage loan transaction, Countrywide Home Mortgage and Bank of America Home Mortgage collection of Ms. Matt's monthly mortgage payments (in which this entity was paid handsomely in fees that were extracted from Ms. Matt's payments), the Trustee's wrongful receipt of Ms. Matt's monthly payments on behalf of the Trust, Bank of America Home Loans prosecution of the wrongful foreclosure action as against Ms. Matt, through its wrongful filing of a complaint to foreclose in the Land Court. All of these actions were undertaken, when Defendants own evidence uncontrovertibly establishes that it is factually and theoretically impossible for any of the Defendants to ever claim ownership to Ms. Matt's loan, as New Century was bankrupt at the time of its purported assignment of Ms. Matt's Loan to HSBC.

224.    Liability should be imposed on all Defendants for the torts perpetrated by each.

225.    Therefore, the requirements for the second type of civil conspiracy recognized in Massachusetts have been met as well.

**COUNT X**: <u>BREACH OF THE COVENANT OF</u>
<u>GOOD FAITH AND FAIR DEALING</u>
(As Against Northeast Mortgage Corporation, New Century Mortgage
Corporation, and HSBC)

226.    Ms. Matt repeats and realleges all paragraphs above as if set forth fully herein.

227.    The contracts between Ms. Matt and Northeast Mortgage Corporation included a duty of good faith and fair dealing.

228.    Pursuant to an implied covenant in the subject contracts, Northeast Mortgage Corporation had a duty not to do anything which would deprive Ms. Matt of the benefits of those contracts, and had a duty to do everything that the contracts presupposed each of the parties would do to accomplish the purpose or purposes of the subject contracts.

229.    Northeast Mortgage Corporation acted in breach of the implied covenant of good faith and fair dealing, and its duties thereunder, when it offered terms to Ms. Consumer prior to closing, and failed to provide those promised terms.

230.    As a result of Northeast Mortgage Corporation's wrongful conduct, Ms. Consumer has suffered and continues to suffer economic losses and other damages.

### COUNT XI: UNJUST ENRICHMENT
### (As Against all Defendants)

231.    Ms. Matt repeats and realleges all paragraphs above as if set forth fully herein.

232.    By their wrongful acts and omissions, including but not limited to making, servicing, and litigating the foreclosure thereof; the predatory and unfair mortgage loan described herein, All Defendants have been unjustly enriched at the expense of Ms. Matt, and thus Ms. Matt has been unjustly deprived.

233.    By reason of the foregoing, Ms. Matt seeks restitution from Defendants, and an order of this Court disgorging all profits, benefits, and other compensation obtained by all Defendants from their wrongful conduct.

**WHEREFORE**,  Ms.  Matt  respectfully  requests  this  court  to provide  the  requested  legal  and  equitable  relief  and  any  other such relief this court deems as just and proper.

<div style="margin-left: 40%;">

Respectfully Submitted
Jodi B. Matt,
By Her Attorney


/s/ Glenn F. Russell, Jr.
Glenn F. Russell, Jr.
The Law Office of
Glenn F. Russell, Jr.
38 Rock Street, Suite 12
Fall River, MA 02720
(508) 324-4545
BBO# 656914
</div>

Dated:  September 22, 2010

## CERTIFICATE OF SERVICE

I, Glenn F. Russell, Jr., do hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and copies will be additionally served by electronic and regular mail upon the following, this is the 22nd day of September, 2010:

Nathalie Salomon
Harmon Law Offices, P.C.
150 California Street
Newton, MA 02458

HSBC Bank USA, National Association
452 Fifth Ave.
New York, NY 10018

Ace Securities Corporation
6525 Morrison Boulevard
Suite #318
Charlotte, NC 28211

Countrywide Home Loans Servicing LP
7105 Corporate Drive
Plano, TX 75024

Wells Fargo Bank, National Association
420 Montgomery St.
San Francisco, CA 94163

Deutsche Bank Securities Inc.
60 Wall Street
New York, NY 10005

Deutsche Bank National Trust Company
60 Wall Street
New York, NY 10005

DB Structured Products Inc.
60 Wall Street
New York, NY 10005

Countrywide Securities Corporation
4500 Park Granada
Calabasas, CA  91302

The Murrayhill Company
1700 Lincoln Street #1600
Denver, CO 80203-4506

Northeast Mortgage Company
800 Main St. #225
Southbury, CT 06488

New Century Mortgage Corporation
18400 Von Karman, Suite 1000
Irvine, CA  92612

Brad A. Morrice
106 Twenty Fourth St.
Newport Beach, CA

Patti M. Dodge
26 Oroville
Irvine, CA  92602

David N. Kenneally
2662 Oak Knoll Drive.
Rossmoor, CA 90720

Stanton and Davis
1000 Plain Street
Marshfield, MA  02050

Harmon Law Office
150 California St.
Newton, MA  02458

Nationwide Title and Escrow Company Inc.
400 Reservoir Ave.
Suite 2K
Providence, RI  02907

Laura M. Tomasello, Esq.
39 Ticklefancy Ln.
Salem, NH  03079

/s/Glenn F. Russell, Jr.
Glenn F. Russell, Jr.

**VERlFICIATION**

I, Jodi B. Matt, do hereby declare that I have read the foregoing Verified Complaint. The same is true to my knowledge except to those matters that are alleged on information and belief; as to those matters, believe them to be true. I also declare that I have not omitted any material facts herein. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this 22nd day of September, 2010 in Norfolk County, Massachusetts.

_____
Jodi B. Matt